UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONCURRENT VENTURES, LLC, et al.,<br>Plaintiffs,<br>v.<br>ADVANCED MICRO DEVICES INC., et al.,<br>Defendants. | Case No. 25-cv-09567-JST<br>**ORDER DENYING MOTION TO DISMISS**<br>Re: ECF No. 156 |

Before the Court is Defendants' partial motion to dismiss. ECF No. 156. The Court will deny the motion.

## I. BACKGROUND

Plaintiffs Concurrent Ventures, LLC, and Xtream Edge, Inc., filed this patent infringement action against Defendants Advanced Micro Devices, Inc., ("AMD") and Pensando Systems, Inc., in the Western District of Texas on March 29, 2024. ECF No. 1. The case was transferred to this district on November 3, 2025. ECF No. 121. Plaintiffs filed the first amended complaint ("FAC") on December 30, 2025. ECF No. 142.

The FAC asserts that Defendants infringe five patents, which broadly aim to "increase the efficiency of communications between computer processing units ('CPUs') and other network components." ECF No. 141-3 ¶ 5. It explains that the asserted patents represent "innovations necessary to create and use [a] specialized unit . . . referred to as a Stream Processing Unit ('SPU')." *Id.* ¶ 6. Defendant Pensando pursued similar solutions and called the resulting products "Data Processing Units ('DPU')"; the products accused of infringing Plaintiffs' patents are all DPUs or related technology. *Id.* ¶¶ 6, 47. When Defendant AMD acquired Pensando in 2022, according to the FAC, it integrated Pensando's DPUs and DPU-enabled systems into its own

United States District Court
Northern District of California

platforms and began to infringe. *Id.* ¶¶ 6, 9, 51.

The instant motion to dismiss was filed on January 30, 2026, arguing that two of the five assrted patents are ineligible for patenting under 35 U.S.C. § 101 and that Plaintiffs fail to allege the requisite knowledge for indirect and willful infringement. ECF No. 156. Plaintiffs opposed on February 20, 2026, ECF No. 161, and Defendants replied on March 6, 2026, ECF No. 174.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," meaning that it provides sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts accept well-pleaded factual allegations in the complaint as true and "construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## IV. DISCUSSION

### A. Patent Eligibility

"Section 101 . . . defines the subject matter eligible for patent protection" as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting 35 U.S.C. § 101). The Supreme Court has "long held that this provision contains an important implicit exception: . . . abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics*, 569 U.S. 576, 589 (2013)). But "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 217. Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other. *Id.*

To determine patent eligibility under Section 101, courts engage in a two-step process. First, courts determine whether the claims at issue are "directed to" an abstract idea. *Id*. To determine the idea to which a claim is directed at step one, courts look to the "focus" of the claims. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns*, LLC, 874 F.3d 1329, 1340 (Fed. Cir. 2017) ("The district court's inquiry centered on determining the focus of the claims, and was thus in accord with our precedent.").

"[S]tep one presents a legal question" only, which "does not require an evaluation of the prior art or facts outside of the intrinsic record." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372, 1374 (Fed. Cir. 2020). Because "there is no . . . single, succinct, usable definition or test" for an abstract idea, the analysis often begins "with an examination of eligible and ineligible claims of a similar nature from past cases." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294–95 (Fed. Cir. 2016). "Under this inquiry, [courts] evaluate the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (internal quotation marks and citation omitted). When a claim recites "a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem," the "functional nature of the claim confirms that it is directed to an abstract idea." *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

If the claims are directed to an abstract idea, the inquiry proceeds to step two. At step two, courts "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 73, 79 (2012)). "Stating an abstract idea 'while adding the words apply it'" or "limiting the use of an abstract idea 'to a particular technological environment'" does not suffice. *Id*. at 223 (first quoting *Mayo*, 566 U.S. at 72; and then quoting *Bilski v. Kappos*, 561 U.S. 593, 610 (2010)). Rather, this step "is satisfied when the claim limitations 'involve more than performance of well-understood, routine, [and] conventional activities previously known to the

industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (alteration in original) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)).

Both parts of the inquiry are informed by "the claims in light of the written description." *Amdocs*, 841 F.3d at 1299. There is no need to analyze every claim where "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction*, 776 F.3d at 1348. "Patent eligibility can be resolved at the Rule 12(b)(6) stage 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *See Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)).

**1. The '634 Patent**

United States Patent No. 10,944,634 ("the '634 patent"), filed on July 15, 2018, purports to provide a "method for network connection optimization." ECF No. 1-4 at 2. It aims to increase computer network efficiency by storing information concerning the bandwidth of past network connections, matching those past network connections to new intended network connections according to geographic location, and using the bandwidth information from the matched past connection a starting point for allocating bandwidth for the matched new network connection. *See, e.g.*, *id*. at 12. Accuracy is important because initial bandwidth allocation that is too high results in data loss while initial bandwidth allocation that is too low results in slow data processing. *Id*. The technology does not require any particular hardware or software, but can be implemented on "a general-purpose computer selectively activated or configured by a computer program stored in the computer." *Id*. at 16.

The parties do not dispute that Claim 8 is representative. *See* ECF No. 156 at 19–21. It recites:

> A tangible, non-transitory, computer-readable media having instructions thereupon which, when executed by a processor, cause the processor to perform a method comprising:
>
> collecting, at a first endpoint device coupled to a network, parameter

> values for determination of bandwidth of network connections to further endpoint devices;
>
> determining at a tuner server, distinct from the first endpoint device and the further endpoint devices, that a next network connection from the first endpoint device to a second endpoint device matches a geographical area of a past network connection; and
>
> initiating the next network connection, from the first endpoint device to the second endpoint device, based on the determination at the tuner server, with a transmission bandwidth based on the parameter values for the past network connection.

ECF No. 1-4 at 17. Claim 8 therefore exemplifies the matching process described above. New network connections are matched to past ones based on "geographic area," meaning the physical location in the world of the endpoint devices being connected. Historical data is stored and the matching determination made at a "tuner server"—a device that is distinct from either endpoint and thus benefits from a higher-level view of the network, meaning that it receives and stores data about all endpoints and connections in a network. *Id.* at 13. And the system calibrates the starting transmission bandwidth of the new connection based on the bandwidth of the matched past network connection. As the patent explains, "[b]y using past or recent tuning results when the same network connection or another network connection in a similar geographic area (such as an apartment complex, neighborhood, or city to city or state to state network connection) is made, an endpoint can shorten the startup time." ECF No. 1-4 at 11.

Defendants contend that "[t]his simple series of steps merely purports to initiate an action (a network connection) based on a geographical area match." ECF No. 156 at 11; ECF No. 174 at 6. They lean heavily on the Federal Circuit's decision in *Sanderling Management Ltd. v. Snap Inc.*, 65 F.4th 698 (2023). That case considered a patent in which mobile devices transmitted their own GPS location data to a central server, which matched the GPS location to a geographic location associated in a database with a particular digital image processing function, and automatically forwarded the digital image processing function back to the mobile device for use transforming a digital image. *Id.* at 701–702. Critical to the court's conclusion that the claims were directed at an abstract idea was its observation that "[t]ypically, . . . the step one analysis for computer-related inventions requires us to 'ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *Id.* at 703 (quoting *Enfish,*

*LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). In *Sanderling*, "[t]he claims of the asserted patents [were] not directed to a specific improvement in computer functionality but, instead, to the use of computers as a tool; here, a tool to identify when a condition is met and then to distribute information based on satisfaction of that condition." *Id*. "[A] 'distribution rule' that merely receives, matches, and then distributes the corresponding function based on the user's location" was a "generic set of steps" not directed at eligible subject matter. *Id*.

While both the *Sanderling* patent and claim 8 of the '634 Patent perform a geographical area match and initiate an action within a network based on that match, the action performed by claim 8 is "directed to a specific improvement in computer functionality"—increasing the efficiency of data transmission between network endpoints. *Enfish*, 822 F.3d at 1335. Moreover, the '634 Patent describes an innovation not only in using historical data to inform the bandwidth allocated to new network connections, but in how that process is implemented—via a separate tuner server inserted into the network to record data, match new connections, and calculate and allocate starting bandwidth.[1] ECF No. 1-4 at 12. *Sanderling* does not carry the weight Defendants assign to it.

The other cases on which Defendants rely are even less helpful. For instance, *Enovsys LLC v. Lyft, Inc.* considered a patent that tracked the location data of two "portable mobile remote units" in order to verify whether the units "have maintained relative proximity during the tracking period," and then "forward[ed] the result of the verification to a network requestor at the end of the tracking period." No. 23-CV-05157-EJD, 2024 WL 3049452, at *1–2 (N.D. Cal. June 17, 2024). This patent claim was even more abstract than the one in *Sanderling*—it merely "collect[ed] location information," "analyz[ed] the information," and "display[ed] the results of that analysis." *Id*. at 7. No particular action was triggered based on the results of the data collection. *Id*. And, as in *Sanderling*, the *Enovsys* patent claim used the computer as a tool rather

[1] Defendants argue that the tuner server is "purely functional" and abstract because it can be located anywhere within the network, ECF No. 156 at 18, but as Plaintiffs repeatedly emphasize, the important "architectural" innovation is the insertion of a data storage and computing device that does something more than an individual endpoint can—it can store data about all connections in a network and leverage that data to set initial bandwidths when a new endpoint is added. *See, e.g.*, ECF No. 161 at 13.



United States District Court
Northern District of California

than improving computer functionality.

*Skillz Platform Inc. v. Aviagames Inc.*, meanwhile, involved a patent for a method that collected location data from clients and used that data to restrict access to a peer-to-peer skill-based digital gaming event to clients falling within a "predefined geolocation." No. 21-CV-02436-BLF, 2022 WL 783338, at *3 (N.D. Cal. Mar. 14, 2022). The court noted that the claims were directed to "the familiar concepts of gathering data, communicating it, comparing it, and managing access to further data." *Id*. at *14. Imposing limitations "by location [wa]s a longstanding practice." *Id*. Much like *Sanderling* and *Enovsys*, the patent in *Skillz Platform* used a computer as a tool to enact basic abstract steps to achieve goals entirely separate from the performance of the computer itself.

Defendants' motion focuses heavily on the use of geographic data. *See, e.g.,* ECF No. 156 at 12 (noting that "[o]ther cases have similarly found location-based claims abstract."). But that the data collected and used is geographic in nature is coincidental or ancillary to the central innovation, which is the use of a distinct entity embedded within a network to collect and analyze historical network connection bandwidth data and use it to make informed, and therefore efficient, decisions about new bandwidth connections. Because it "purposefully arranges the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks," the patent is eligible. *Amdocs*, 841 F.3d at 1301.

The motion to dismiss also cites several cases finding patents ineligible that described simple data matching processes. For instance, in *Intellectual Ventures I LLC v. Symantec Corp.*, the Federal Circuit found abstract a claim that recited "determining . . . whether each received content identifier matches a characteristic of other identifiers" and then "outputting . . . an indication of the characteristic of the data file based on said step of determining." 838 F.3d 1307, 1314 (Fed. Cir. 2016). And in *In re Rosenberg*, the court found abstract a claim reciting "collect[ing] data[] to evaluate changes in the data as compared with data collected previously" and "determining . . . whether procedures or parameters . . . require modification" based on the compared data. 813 F. App'x 594, 595 (Fed. Cir. 2020). The *Intellectual Ventures* claim essentially described any process of sorting or filtering, 838 F.3d at 1313–14, while the *Rosenberg*

claim described the process of collecting and analyzing information about a program (there, a clinical trial) and then modifying that program based on learnings from the data, 813 F. App'x at 597. Because the '634 patent does not merely collect data and make unspecified and generic decisions based on that data, these cases likewise do not aid AMD.

The claims describe a concrete improvement in computer functionality—namely, use of a novel addition to network architecture (the tuner server) to collect specified types of data about historical connection bandwidth requirements (e.g., geographic location of endpoints) and to implement those data learnings in a specific way to improve network efficiency (by setting starting bandwidths for new connections). The patent is "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks" and is eligible under step one of the *Alice* eligibility framework. As such, the Court does not proceed to step two.

**2. The '767 Patent**

United States Patent No. 9,529,767 ("the '767 patent"), issued on December 27, 2016, concerns computer storage technology. ECF No. 1-5 at 2. The patent explains that a prior art host computer must "support and manage" both Serial Advanced Technology Attachment ("SATA") and Serial Attached SCSI ("SAS") storage interface protocols in order to interact with both SATA and SAS-supported storage media devices ("SMDs") (e.g., hard drives). ECF No. 1-5 at 12. In addition, a prior art host computer delivers commands to the hard drive through a storage controller (a type of computer chip) that is also specific to either the SATA or SAS protocol. *Id.*[2] The '767 patent presents a "system and method for abstracting SATA and/or SAS storage media devices via a full duplex queued command interface." *Id.* at 12. In other words, the patent allows host computers to communicate with hard drives and other SMDs without having to manage both SATA and SAS protocols. *Id.* at 13. It does so by interposing an abstraction protocol for the host to use, while also inserting at least two layers of storage controllers that translate the abstract "high-level access commands" into SATA or SAS. *Id.* This aims "to increase performance, lower host overhead, and simplify scaling storage media devices and systems." *Id.* at 12. The parties do

[2] While a SATA controller can interface only to a SATA SMD, a SAS controller can interface with either a SATA or a SAS SDM. ECF No. 1-5 at 12.

not dispute that claim 1 is representative. ECF No. 156 at 27–29. It recites:

> A routable packet-switched network supported by an abstraction protocol comprising:
>
> at least one host;
>
> a master controller, the master controller comprising a master processing element, a master controller interface to communicate with the host, and at least one master controller control link interface; and
>
> at least one edge controller, the edge controller comprising an edge processing element, an edge controller control link interface to communicate with the master controller via the master controller control link interface, and at least one storage media device interface to communicate with at least one storage media device,
>
> wherein the master controller and the edge controller communicate via the abstraction protocol, the abstraction protocol comprising a full-duplex protocol supporting full command queuing for the at least one storage media device; and
>
> wherein the edge controller further comprises at least one other master controller further in communication with at least one other edge controller, when the edge processing element associated with the edge controller authors abstract protocol messages intended for the other edge controller.

ECF No. 1-5 at 17.

Defendants contend that this patent is "directed to the abstract idea of translating commands or instructions from one format (the 'abstraction protocol') to another (e.g., SATA or SAS protocols)." ECF No. 156 at 22. But the patent is not directed to an abstract idea merely because it incorporates the idea of translating commands. Rather, the patent identifies a specific solution to a specific problem to improve computer functionality. It aims to minimize costs to host computers of communication with SATA or SAS SMDs by enabling the host computer to utilize a single abstraction protocol that is "translated" to SATA or SAS via a specific architecture including at least one master controller (which receives abstracted commands) and at least one edge controller (which delivers SATA or SAS commands to the SMD). ECF No. 1-5 at 13; ECF No. 141-3 ¶¶ 33–37. Moreover, the "abstraction protocol" has specific features; it is "full-duplex," meaning that it enables two-way communication, and it supports "full command queuing." ECF No. 141-3 ¶ 35. This design addresses system cost and scalability while

preserving interoperability. ECF No. 1-5 at 17.

Defendants would rely on *directPacket Rsch., Inc. v. Polycom, Inc.*, but that case is readily distinguishable. No. 2024-1147, 2025 WL 1752247, at *1 (Fed. Cir. June 25, 2025). The patent at issue recited converting a multimedia data stream from text-based to binary or vice versa, at a communication controller, with an intermediate protocol in between, and transmitting the result to a target communication device. *Id*. In other words, the patent merely received, translated, and transmitted data; nothing about the location (a communication controller) or the intermediate protocol step was relevant or inventive. *Id*. at *4–5. A similar analysis applies to *Hawk Technology Systems, LLC v. Castle Retail, LLC*, which considered "claims . . . directed to a method of receiving, displaying, converting, storing, and transmitting digital video 'using result-based functional language.'" 60 F.4th 1349, 1357 (Fed. Cir. 2023) (quoting *Two-Way Media*, 874 F.3d at 1337). It stated only "general abstract ideas—displaying images, converting them into a format, transmitting them, and so on." *Id*.

Here, the '767 patent shifts the burden of differentiating commands between SAS and SATA SMDs from the host to a system of master and edge controllers, which aims to improve the efficiency and performance of host communication with SMDs. This is not directed to the abstract idea of translation, but to "a specific improvement in computer functionality," which courts have repeatedly found supports patent eligibility. *Enfish*, 822 F.3d at 1335. Because the '767 patent is also eligible at *Alice* step one, the Court again does not proceed to step two.

**B. Indirect Infringement and Willfulness**

Plaintiffs allege that Defendants have indirectly infringed (both by inducement and contribution) and willfully infringed the asserted patents. ECF No. 141-3 ¶¶ 54, 69, 82, 96, 108, 124. Claims of indirect and willful infringement require allegations that plausibly support an inference that Defendants knew of the asserted patents and knew—or were willfully blind to the fact—that their conduct infringed. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639, 642 (2015); *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). Defendants argue that the claims for willfulness and indirect infringement should be dismissed because Plaintiffs have

insufficiently alleged Defendants' knowledge. ECF No. 156 at 29. The Court disagrees. Plaintiffs' allegations are sufficient to raise a plausible inference of Defendants' knowledge at the pleading stage.

**1. Post-Suit Knowledge**

Plaintiffs first argue that "knowledge of a patent based on the filing of a complaint is sufficient to meet the requirement for an induced infringement claim." ECF No. 161 at 26 (quoting *VIA Techs., Inc. v. ASUS Comput. Int'l*, No. 14–cv–03586–BLF, 2015 WL 3809382, at *3 (N.D. Cal. June 18, 2015)). On that basis, Plaintiffs argue that AMD cannot justify dismissal of indirect infringement and willful infringement claims for the period after the complaint was filed. *Id*. Indeed, there is a "split among district courts as to whether a complaint provides adequate notice of willful and indirect infringement." *See VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953, 996 (N.D. Cal. 2023), *rev'd and remanded on other grounds*, 172 F.4th 1348 (Fed. Cir. 2026) (collecting cases).

As Defendants argue[3] and this Court has previously concluded, the existence of a complaint will not generally suffice to establish the requisite knowledge. *See Hewlett Packard Enter. Co. v. Inspur Grp. Co.*, No. 24-CV-02220-JST, 2025 WL 754265, at *25 (N.D. Cal. Mar. 10, 2025) ("[T]o survive a motion to dismiss [a willful infringement claim], a plaintiff must plausibly plead that the defendant had pre-suit knowledge of the patent-in-suit and that the defendant infringed it deliberately or intentionally."). "[B]ecause a complaint and infringement contentions are a necessary part of patent litigation, a finding that they alone satisfy post-suit notice would invite claims of willful infringement and indirect infringement into literally every

[3] Plaintiffs have filed a motion to strike or file a sur-reply addressing Defendants' argument that allegations of pre-suit knowledge are required to sustain indirect or willful infringement claims, which they characterize as an improper new argument in the reply. ECF No. 186. As Defendants point out, however, their opening brief directly argued that point. ECF No. 189 at 2 (citing ECF No. 156 at 32). Defendants' elaboration in the reply is not new, but properly responds to Plaintiffs' arguments in opposition that the filing of the complaint suffices to put Defendants on notice of their infringement. ECF No. 174 at 18–19. The motion to strike or file a sur-reply is denied. *See Haldiman v. Cont'l Cas. Co.*, No. CV-13-00736-PHX-DLR, 2014 WL 12670637, at *9 (D. Ariz. Aug. 26, 2014), *aff'd,* 666 F. App'x 612 (9th Cir. 2016) (denying motion to strike or file a sur-reply "because Defendant does not raise a new argument but only rebuts arguments first raised by Plaintiff in her opposition").

United States District Court
Northern District of California

patent suit." *VLSI Tech.*, 706 F. Supp. 3d at 996. Moreover, "allowing the complaint to serve as notice would circumvent the worthwhile practice to send a cease-and-desist letter before suit." *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 646 (N.D. Cal. 2022). As such, Plaintiffs must allege pre-suit knowledge.[4]

**2. Pre-Suit Knowledge**

Plaintiffs argue that the following facts plausibly establish pre-suit knowledge. ECF No. 161 at 27–28. First, Plaintiffs argue that AMD met with HellaStorm, Concurrent Ventures' commercialization partner, for "detailed technical discussions" in June 2014 which revealed the specifics of technology that would later become the asserted patents. ECF No. 141-3 ¶¶ 48–49. Second, HellaStorm met with Dell in 2019 and provided the specifics of Concurrent Ventures' patented technology to participants, including Robert Hormuth, a Dell employee who would become a vice president at AMD a year later. *Id.* ¶ 50. About two years after Hormuth joined AMD, AMD acquired Pensando and began infringing; "[o]n information and belief, it was Hormuth's knowledge of the patented technology that prompted AMD to acquire Pensando and thus to begin infringing." *Id.* ¶¶ 6, 51. Also "on information and belief, Mr. Hormuth also informed Pensando, both before and after the acquisition of its use of Concurrent Ventures' patented technology." *Id.* That Defendants infringed knowingly, according to Plaintiffs, is further evidence by "the otherwise unexplained similarities between Defendants' Accused Products and their marketing and the Plaintiffs' patented technology and marketing," "the small number of players in the DPU/AI [Network Interface Card] market, Plaintiffs' pioneering role in that market, and Defendants' direct competition against Plaintiffs" and AMD's "intense interest in the DPU market, evidenced by its nearly $2 billion acquisition of Pensando and its subsequent focus in marketing and advertising on their DPUs, particularly for AI applications." *Id.* ¶ 52.

As Defendants point out, the 2014 meeting between HellaStorm and AMD occurred before

---

[4] Even when courts allow a complaint to supply the requisite knowledge required for willfulness, they tend to require the complaint to contain detail "akin to a claim infringement chart" and for the defendant to have had "a reasonable period of time to evaluate the complaint's contentions." *Dali Wireless, Inc. v. Corning Optical Commc'ns LLC*, 638 F. Supp. 3d 1088, 1099 (N.D. Cal. 2022) (citations omitted). Plaintiffs' briefing does not address either element.

any of the asserted patents had issued. ECF No. 141-3 ¶ 18 (first asserted patent to issue was on December 30, 2014). But "pre-patent conduct" may comprise part of the totality of the circumstances supporting a finding of willfulness. *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992); *see also Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 979 (Fed. Cir. 1986). While of limited value on its own, the 2014 meeting at least suggests that the technologies underlying the asserted patents were on AMD's radar from that point on.

The 2014 and 2019 meetings, in combination with the industry structure details (small number of players, Plaintiffs' pioneering role, positioning as direct competitors, AMD's high investment in the DPU market), raise a plausible inference of knowledge. These details distinguish this case from decisions of this district finding general or conclusory allegations of industry knowledge insufficient. In *Elec. Scripting Prods., Inc. v. HTC Am. Inc.*, for instance, the court found the entirely "conclusory statement that 'Plaintiff's Patents were well known to defendants'" and allegations regarding "defendant's exercise of due diligence pertaining to intellectual property affecting its Devices" insufficient to plead knowledge. No. 17-CV-05806-RS, 2018 WL 1367324, at *6 (N.D. Cal. Mar. 16, 2018). And in *Nanosys, Inc. v. QD Vision, Inc.*, the court found the allegation that defendant's "founders and key employees were, at least, aware of and knowledgeable about developments and advances in the field and patent filings through their activities conducted through industry conferences, research, and development" insufficient to support an inference of pre-suit knowledge of patent, in part because "Plaintiffs fail to expound upon the connections which they argue, but do not plead, exist given this particular market." No. 16-cv-01957-YGR, 2016 WL 4943006, at *4 (N.D. Cal. Sept. 16, 2016).

To be sure, this is a close case and key facts are missing from the complaint. For example, Plaintiffs do not identify any facts establishing that Defendants knew that Plaintiffs had applied for or received the asserted patents. *See Corephotonics, Ltd. v. Apple, Inc.*, No. 17-CV-06457-LHK, 2018 WL 4772340, at *9 (N.D. Cal. Oct. 1, 2018) (denying a motion to dismiss willfulness allegations where "Apple knew about Corephotonics' technology, knew about Corephotonics' patent applications, and then instructed Corephotonics not to share Corephotonics' issued patents

with Apple”). Relatedly, Plaintiffs do not specifically allege that Defendants were monitoring Plaintiffs’ products and patents. *See, e.g.*, *Suprema, Inc. v. Int’l Trade Comm’n*, 626 F. App’x 273, 280 (Fed. Cir. 2015) (considering as part of the totality of the circumstances that “when Suprema developed the accused products, it admitted to engaging in extensive market research on its competitors”). More will be required to establish entitlement to enhanced damages for willfulness. *See, e.g., State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (no willful infringement where Defendant was aware of a patent pending notice but not any issued patent). But at the pleading stage, Plaintiffs have raised a plausible inference that Defendants’ alleged infringement was willful.

**CONCLUSION**

For the reasons set forth in this order, the motion to dismiss, ECF No. 156, is denied in full.

**IT IS SO ORDERED.**

Dated: September 15, 2026

JON S. TIGAR
United States District Judge