UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONCURRENT VENTURES, LLC, et al.,

Plaintiffs,

v.

ADVANCED MICRO DEVICES INC., et al.,

Defendants.

Case No. 25-cv-09567-JST

**CLAIM CONSTRUCTION ORDER; ORDER DENYING LEAVE TO FILE SUPPLEMENTAL EVIDENCE**

ECF Nos. 79, 80, 115, 118, 306

The parties propose competing constructions of eleven terms from five asserted patents.[1] The Court will construe the terms as follows. The Court will also deny Defendants' motion for leave to file supplemental evidence.

## I. BACKGROUND

Plaintiffs Concurrent Ventures, LLC, and Xtream Edge, Inc., filed this patent infringement action against Defendants Advanced Micro Devices, Inc., and Pensando Systems, Inc., in the Western District of Texas on March 29, 2024. ECF No. 1. The case was transferred to this district on November 3, 2025. ECF No. 121.

Plaintiffs assert five patents, which broadly aim to "increase the efficiency of communications" between computer processing units ("CPUs") "and other network components." ECF No. 142 ¶ 5. The five asserted patents are:

- U.S. Patent No. 8,924,596 ("'596 patent"), which "relates generally to the field of load distribution" and more specifically "to a system and method for dividing and

[1] This district's patent rules allow the parties to submit only ten terms for construction. *See* Patent Local Rule 4-3(c). At the claim construction hearing, Defendants made an oral motion to construe an eleventh term the parties had briefed before the case was transferred to this district. *See* ECF Nos. 113–15, 118. The Court will grant that motion and construe the eleventh term.

synchronizing a processing task across multiple processing elements/processors in hardware," '596 patent, 1:9–13;

- U.S. Patent No. 9,529,767 ("'767 patent"), which "relates generally to the field of storage devices" and more specifically "to a system and method for abstracting SATA and/or SAS storage media devices via a full duplex queued command interface to increase performance, lower host overhead, and simplify storage media devices and systems," '767 patent, 1:13–19;
- U.S. Patent No. 10,873,753 ("'753 patent"), which relates to "[a] platform for data flow processing," '753 patent, abstract;
- U.S. Patent No. 10,985,943 ("'943 patent"), which relates to "[a] programmable device for data flow processing in a user-configurable server with swappable pods or cards," '943 patent, abstract;
- U.S. Patent No. 10,944,643 ("'634 patent"), which relates to "[a] method for network connection optimization," '634 patent, abstract.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

Claim construction is a question of law to be determined by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation modified). Accordingly, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite fundamental dispute between parties). The "correct conclusion" is one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per*

*Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)). The ordinary and customary meaning of a claim term is "the meaning a person of ordinary skill in the art at the time of the invention would have given [it]." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1042 (Fed. Cir. 2019). Claim construction deviates from ordinary and customary meaning only if "a patentee sets out a definition and acts as his own lexicographer" or "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1362 (Fed. Cir. 2012).

To discern a term's ordinary and customary meaning, courts "begin[] with the words of the claim." *Elkaw Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999). However, because claims "do not stand alone," they "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citation modified); *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("Claim construction requires a determination as to how a person of ordinary skill in the art would understand a claim term in the context of the entire patent, including the specification.") (citation modified)). The specification "is always highly relevant to the claim construction analysis" and is usually "the single best guide to the meaning of the disputed term." *Phillips*, 415 F.3d at 1315 (citation modified).

In addition to consulting the specification, "the court should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. This history, which often contains "express representations made by the applicant regarding the scope of the claims," can be "of critical significance in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Finally, courts may consider extrinsic evidence, such as "dictionaries, and especially technical dictionaries, [which] can assist the court in determining the meaning of particular terminology to those of skill in the art" because they "endeavor to collect the accepted meanings



United States District Court
Northern District of California

of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. However, "such evidence is generally of less significance than the intrinsic record[.]" *Allergen Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019). Courts may also consider expert and inventor testimony, but they "should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Phillips*, 415 F.3d at 1317–18 (citation modified).

## IV. DISCUSSION

### A. "queue implemented in hardware" ('596 patent, claims 1, 7, and 13)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "queue implemented in physical circuits without software intervention"<br>Alternatively, indefinite under Plaintiffs' infringement theories | Plain and ordinary meaning | Plain and ordinary meaning, which does not exclude software intervention<br>Not indefinite |

Defendants argue the term "queue implemented in hardware" encompasses only queues for which "dedicated physical circuits" perform all "queue functions and management," without any software intervention. ECF No. 79 at 7. Plaintiffs argue the term needs no construction, noting that Defendants have not argued the patentee "'act[ed] as his own lexicographer' or 'disavow[ed] the full scope of the claim term,' as is required to construe a term 'outside of its plain and ordinary meaning.'" ECF No. 80 at 7 (quoting *Thorner*, 669 F.3d at 1365). Though Plaintiffs insist that "[a]dopting the plain and ordinary meaning" would resolve the present dispute, they do not say precisely what they believe the plain and ordinary meaning is. *See id.* at 10.

The Court agrees that Defendants have not provided a reason to depart from the term's plain and ordinary meaning. That does not mean, however, that the term requires no construction. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1360 (citation modified). Here, the parties fundamentally disagree about what it means for a queue to be "implemented in hardware"—



United States District Court
Northern District of California

specifically, whether software can be involved in executing queue functions and management. *See* ECF No. 79 at 7–10; ECF No. 80 at 7–11. Accordingly, the Court must resolve the question whether a person of ordinary skill in the art ("POSITA") would understand "queue implemented in hardware," in the context of the entire patent, to include only queues that are implemented in hardware without any software intervention. *See Bradium Techs.*, 923 F.3d at 1042.

The Court "begins with the words of the claim." *Elkaw Mfg. Co.*, 192 F.3d at 977. Claims 1, 7, and 13 all recite "an input queue implemented in hardware" and "an output queue implemented in hardware." '596 patent, 11:27–28, 11:66–67, 12:36–37. These claims further recite processes in which software interacts with hardware to read and issue commands to the queues. Claim 1, for example, recites several hardware features that interact with the queues, including "a first processing element" that has "access to said input queue and said output queue"; "at least one second processing element in communication with said first processing element"; and "a reservation register implemented in hardware storing a value indicative of available space in said input queue, said reservation register accessible by both said first processing element and said at least one second processing element." *Id.*, 11:29–37. Claim 1 then recites "computer storage storing instructions," *i.e.*, software, which are "executed by said at least one second processing element" to "access[] said reservation register and read[] said stored value," "determine[] when said read value indicates available space in said input queue for said first processing element to issue a command," and "notif[y] said first processing element to issue said command to said input queue." *Id.*, 11:38–46. In other words, the claim recites a process in which software instructs the relevant hardware components to read and issue commands to the input queue. This language clearly requires that the queue be implemented with software intervention. The same is true for claims 7 and 13, both of which recite "computer storage storing instructions" that are to be executed by a "second processing element" to, *inter alia*, "determine[]" whether there is "available space in said input queue" and "issue[] . . . command[s] to said input queue." *Id.*, 12:10–18, 12:46–54.

The specification likewise confirms that the recited queues are implemented with software intervention. At a high level, the specification states that "[t]he invention considers the case where

United States District Court
Northern District of California

software must issue commands to a hardware module." *Id.*, 3:11–12. More specifically, the specification describes multiple embodiments in which software directs hardware components to issue commands to the recited queues. *See, e.g.*, *id.*, 6:28–36 (describing "computer storage storing instructions, which when executed by one of the additional processing elements . . . issue the command to the input queue"). The Court declines to adopt a construction that would exclude such embodiments. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) ("[A] claim construction excluding a preferred embodiment is rarely, if ever[,] correct.").

Defendants' efforts to recast the intrinsic evidence are unpersuasive. First, Defendants contend that the portions of the claims and specification reciting software that reads values from and issues commands to the queues "only describe how software may *use* a queue by reading from and writing to it; they do not address how the queue is implemented." ECF No. 81 at 9. But while Defendants allude to a distinction between "usage" and "implementation," they offer no reasoned basis for drawing this distinction. Defendants do not, for example, explain what "implementation" would entail if not "reading from or writing to" the queue. *See id.* Indeed, Defendants' own expert describes these functions—reading and writing—as part of queue implementation. ECF No. 79-3 ¶ 15 ("When a queue is implemented in hardware, there are dedicated physical circuits for queue functions and management, including, e.g., a write pointer that indicates where the next entry should be written to, a read pointer that indicates where the next entry should be read from, and storage elements for data in the queue, etc.").

Second, Defendants point out that the specification also repeatedly emphasizes the functional advantages of hardware over software. ECF No. 79 at 8–9. And so it does. *See, e.g.*, '596 patent, 1:20–34 (explaining that the invention is "an improvement over prior art systems and methods" because "[i]n the prior art, such synchronization is performed using software techniques," which "takes additional processing time"); *id.*, 4:13–18 (explaining that in the invention "[a]ll arbitration and mutual exclusion tasks between multiple processing elements are handled in hardware," so "[t]here is no need for the software overhead of multiple processing elements handling the synchronization of a shared available space count variable in a shared memory or otherwise"). But the fact that the patent contemplates that hardware will take on some

of the tasks performed by software in the prior art does not necessarily mean that software will play no role. Indeed, the specification clearly contemplates that software *will* play a role and, thus, that hardware will reduce but not eliminate the reliance on software to perform the relevant tasks.

Third, Defendants contend that a construction allowing software intervention in queue implementation would render the words "implemented in hardware" superfluous. ECF No. 79 at 7–8. Defendants distinguish between "queue[s] implemented in hardware," in which, according to Defendants, "dedicated physical circuits" perform all "queue functions and management," and "queue[s] implemented in software," in which "software maintains and uses a data structure in memory (e.g., RAM) as a queue." *Id.* at 7. Defendants observe that both hardware queues and software queues "involve hardware to some extent" because, "after all, software is executed on hardware processors." *Id.* at 7. Thus, Defendants argue, "the distinguishing characteristic between a queue implemented in software, versus a queue implemented in hardware, is whether software is involved in that implementation." *Id.* at 7.

Though this argument has some intuitive appeal, it cannot be reconciled with the unambiguous language of the claims and specification. The plain and ordinary meaning of a claim term is its meaning in the context of the patent, "not the meaning of the term in the abstract." *Phillips*, 415 F.3d at 1321. The context here makes clear that the recited "queue[s] implemented in hardware" are implemented with software intervention. Moreover, this construction need not render the words "implemented in hardware" superfluous. Though a "queue implemented in software" would, as Defendants observe, still require hardware to execute software instructions, the software queue, according to Defendants' construction, would require software instructions for each element of queue management, including storage, reading, and writing. *See* ECF No. 79 at 7. By contrast, a "queue implemented in hardware" *with software intervention* could use hardware to perform at least some queue functions independent of software. Here, for example, the claims provide that "a reservation register implemented in hardware" will store queue values to be read by the recited software. '596 Patent, 11:33–34, 12:5–6, 12:41–42. In other words, the claims assign certain functions—storage—to hardware and other functions—reading and writing—to software. Thus, the plain and ordinary meaning of a "queue implemented in hardware," in the



United States District Court
Northern District of California

context of the patent as a whole, is a "queue implemented in hardware" with software intervention.

Finally, Defendants argue that construing the term to permit software intervention renders the claims indefinite. A patent "is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "'Reasonable certainty' does not require 'absolute or mathematical precision.'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (citation modified). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

The Court finds that Defendants have not met this burden. Defendants contend that "[b]y alleging that a 'queue implemented in hardware' can include queues implemented using software, Plaintiffs remove the boundaries created by this claim language, and a POSITA would not be able to discern, with reasonable certainty, when a queue is implemented in hardware, and when it is not." ECF No. 79 at 10. The only evidence Defendants cite for this conclusion, however, is the testimony of their expert, Dr. Jacob Baker, who similarly asserts that "Plaintiffs' interpretation removes the boundary between a queue implemented in hardware versus a queue implemented in software" and, thus, that "[a] POSITA would be unable to ascertain, with reasonable certainty, the boundaries of this claim under term under Plaintiffs' interpretation." ECF No. 79-3 ¶ 38. Notably, Dr. Baker's assessment appears to be based, at least in part, on his erroneous conclusion that "[n]owhere does the specification describe queues implemented in memory, managed or controlled by software." *Id.* ¶ 35. As described in detail *supra*, the claims and specification both explicitly assign certain queue functions (namely, reading values from queues and sending commands to queues) to software. Dr. Baker's testimony on this question is thus "clearly at odds" with the intrinsic evidence. *See Allergen Sales*, 935 F.3d at 1317–18. Defendants have not met their burden of showing, by clear and convincing evidence, that a POSITA would be unable to discern the scope of the claims with reasonable certainty.

/ / /

/ / /

**B. "register" ('596 patent, claims 1, 7, and 13)**

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "set of flip-flops that store a set of related bits" | Plain and ordinary meaning | Plain and ordinary meaning |

The parties disagree about the scope of their dispute as to this term. Defendants assert that "[t]he parties dispute whether the claimed register must be a hardware register, or whether it can be satisfied by a memory location used for storing a variable, e.g., in RAM." ECF No. 79 at 11. Plaintiffs, by contrast, assert "[t]here is no dispute that the [claimed] 'register' must be 'implemented in hardware.'" ECF No. 80 at 12. Rather, according to Plaintiffs, "[t]he actual dispute is whether a 'register' should be defined as only a 'set of flip-flops.'" ECF No. 80 at 12.

The Court agrees that Defendants mischaracterize the dispute. The term the parties have chosen to be construed is not, as Defendants appear to suggest, "register implemented in hardware." *See, e.g.*, ECF No. 79 at 11 (arguing "the claimed register must be a hardware register" because the claims recite a "register implemented in hardware"). The term to be construed is simply "register." That said, the Court finds that Defendants' proposed construction is overly restrictive as applied to both "register" and "register implemented in hardware." The Court evaluates each in turn.

First, Defendants have not shown that a "register" is a "set of flip-flops that store related bits." *See* ECF No. 79 at 10. The only intrinsic evidence Defendants cite in support of this conclusion are those portions of the patent describing the claimed register as one "implemented in hardware." *See, e.g.*, ECF No. 79 at 11 (noting the independent claims "require that the register be implemented in hardware"); *id.* ("The specification confirms that the register is implemented in hardware."). While this language undoubtedly supports the conclusion that the claimed register must be "implemented in hardware," it does not support the conclusion that the term "register," by definition, must be "implemented in hardware." In fact, this language belies that conclusion: Were all registers "implemented in hardware," there would seem to be no need for the patent to clarify that the claimed register is to be "implemented in hardware." The Court must adopt a

construction "with an eye toward giving effect to all terms in the claim," and thus it declines to construe "register" in a way that would render the words "implemented in hardware" redundant and superfluous. *See Bicon, Inc. v. Staumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

Second, Defendants also have not shown that a "register implemented in hardware" must be a "set of flip-flops that store a set of related bits." *See* ECF No. 79 at 10. Defendants cite no intrinsic evidence to support this conclusion. Indeed, the word "flip-flop" appears nowhere in the patent or in the prosecution history. Defendants argue instead that "[h]ardware registers were well known in the art to be basic circuit components implemented using flip-flops." ECF No. 79 at 11. They point to a technical dictionary and several electrical-engineering textbooks indicating that registers are commonly formed from flip-flops. ECF No. 79 at 12–13; *see, e.g.*, ECF No. 79-5 at 11 (defining register as "a circuit formed from identical flip-flops or latches and capable of storing several bits of data"); ECF No. 79-6 at 13 ("Normally a byte containing *N* bits is stored in a set of *N* flip-flops. This set of flip-flops is then referred to as a *register*." (emphasis in original)); ECF No. 79-7 at 9 ("The simplest of the storage components is a *register* which can be thought of as a bitwise extension of a flip-flop." (emphasis in original)). Defendants also offer expert testimony to this effect. ECF No. 79-3 ¶ 19 ("In short, a register consists of a set of flip-flops that store a set of related bits.").

Plaintiffs respond that Defendants' construction is reductive because "a 'register' can be implemented in other ways and has a broad meaning, far beyond just a collection of flip-flops." ECF No. 80 at 13. According to Plaintiffs, "[f]undamentally, a 'register' is a storage area that can be addressed by name, and thus a 'register implemented in hardware' is a storage area implemented in hardware that can be addressed by name." *Id.* Plaintiffs offer expert testimony explaining that a POSITA would understand that "there are a variety of ways that a register can be implemented, such as usable Static Random Access Memory (SRAM)," and that SRAM generally "utilizes transistors," not flip-flops, "to store information or data." ECF No. 80-2 ¶¶ 38–44. Plaintiffs also point to various technical dictionary definitions indicating that registers that do use flip-flops are not comprised solely of flip-flops, *see, e.g.*, ECF No. 80-3 at 17 (defining "register" to include "[l]ogic elements (gates, flip-flops, shift registers)"), and that "register" has a meaning



United States District Court
Northern District of California

broader than its component parts, *see, e.g.*, ECF No. 80-4 at 5 (defining "register" as "[a] memory location within a microprocessor, used to store values and external memory addresses while the microprocessor performs logical and arithmetic operations on them"). ECF No. 80 at 13–14.

The Court agrees that Defendants' proposed construction is too limiting. While Defendants' extrinsic evidence suggests that hardware registers commonly contain flip-flops, it does not follow that they *must* contain flip-flops or that they are, by definition, "a set of flip-flops." Defendants insist their proposed construction "simply requires that a register contains flip-flops, not that they are exclusive." ECF No. 81 at 11. But defining a "register implemented in hardware" as "a set of flip-flops" indicates that the two phrases are equivalent, not that the former contains the latter. The Court declines to adopt such a construction.

Having rejected Defendants proposed construction, the Court finds it sufficient to give the term "register" its plain and ordinary meaning. Because the parties agree that the claimed register must be a "register implemented in hardware," *see* ECF No. 79 at 11; ECF No. 80 at 12, no further construction is needed.

### C. "abstraction protocol" ('767 patent, claims 1, 2, 4, 6, and 16)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| Indefinite<br>Subject to § 112(f), claimed function: abstracting communication of commands between master controller and edge controllers, corresponding structure: none | Plain and ordinary meaning | Plain and ordinary meaning, which is not subject to § 112(f) and is not indefinite |

Defendants contend, first, that the term "abstraction protocol" does not connote structure and is thus subject to 35 U.S.C. § 112(f). Under Section 112(f), claims may be drafted "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and [] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f). Section 112(f) represents "a balance in allowing patentees to express a claim limitation by reciting a function to

be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). To determine whether a claim term is subject to Section 112(f), courts begin with the language of the claim. "[U]se of the word 'means' in a claim element creates a rebuttable presumption" that Section 112(f) applies. *Id.* at 1348. Conversely, "the failure to use the word 'means' also creates a rebuttable presumption—this time that [Section 112(f)] does not apply." *Id.*[2]

Here, claim 1 recites a "master controller" and an "edge controller" that "communicate via the abstraction protocol, the abstraction protocol comprising a full-duplex protocol supporting full command queuing for the at least one storage media device." '767 patent, 12:46–50. Dependent claims 2, 4, and 6 all refer to the same "abstraction protocol" recited in claim 1. *Id.*, 12:58, 12:66, 13:5. Claim 16, similar to claim 1, recites a "first edge controller" and a "second edge controller" that "communicate via the abstraction protocol, the abstraction protocol comprising a full-duplex protocol supporting full command queuing for the at least one storage media device." *Id.*, 14:27–32.

Because these claims do not use the word "means," the Court begins with the rebuttable presumption that Section 112(f) does not apply. To overcome this presumption, Defendants must show that "the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1347 (citation modified). In other words, Defendants must "show, by a preponderance of the evidence, that persons of ordinary skill in the art would not have understood the ['abstraction protocol'] limitations to connote structure in light of the claim as a whole." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022).

As an initial matter, the Court agrees with Defendants that the claims describe the "abstraction protocol" in terms of its function. *See* ECF No. 79 at 17. Claims 1 and 16 both recite controllers "communicat[ing] *via* the abstraction protocol." '767 patent, 12:46–50, 14:27–32

[2] Section 112(f) was formerly numbered 112(6). *See id.* Quotations referring to the old numbering have accordingly been modified.

United States District Court
Northern District of California

(emphasis added). In other words, they describe the function of the "abstraction protocol" as enabling communication between the controllers. Plaintiffs take issue with this reading, arguing that "[j]ust as giving a speech in English does not mean that the English language is itself what gave that speech, communicating via the 'abstraction protocol' does not mean that 'abstraction protocol' is what performs the action of 'communicating.'" ECF No. 80 at 16. The point, however, is not that "the English language is itself what gave [the] speech" but, instead, that the English language was the *means* by which the speaker gave the speech. *See id.* Here, the abstraction protocol is the means by which the recited controllers communicate.

The Court concludes, nonetheless, that the term is not subject to Section 112(f). Section 112(f) does not apply when "persons skilled in the art would understand the claim language to refer to structure," *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020), and thus the question is "whether the 'term, as a name for the structure, has a reasonably well understood meaning in the art," *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) (quoting *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)). To continue Plaintiffs' analogy, although a claim might recite "the English language" as a means for giving a speech, the term "English language" would not be subject to Section 112(f) because a POSITA would understand the term to connote a sufficiently specific structure. *See Dyfan*, 28 F.4th at 1367. Moreover, "[c]laim terms 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke [Section 112(f)]." *Dyfan*, 28 F.4th at 1366.

Here, a POSITA reading the claims as a whole would understand "abstraction protocol" to connote a sufficiently specific structure. According to Defendants, "[a] 'protocol' is a set of rules that define a procedure to follow when transmitting and receiving data between devices," while "'abstraction' is a well-known technique that involves simplifying, generalizing, or hiding underlying details in a design or system." ECF No. 79 at 16. As Defendants' own expert, Dr. Darrell Long, acknowledges, "[t]he plain meaning of 'abstraction' and 'protocol' would have suggested to a POSITA that an 'abstraction protocol' is a simplified or generalized protocol.'" ECF No. 79-10 ¶ 16. This description aligns with that of Plaintiffs' expert, Dr. Paul Min, who

similarly asserts that "a person of ordinary skill in the art would understand that the 'abstraction protocol' refers to a protocol by which details of underlying hardware and software are hidden to the programmer to accomplish a particular task in a more generic manner." ECF No. 80-2 ¶ 49. In other words, "abstraction protocol" refers to "a class of structures"—*i.e.*, simplified protocols. *See Dyfan*, 28 F.4th at 1366.

Moreover, the surrounding claim language explains what this protocol must be able to do. Claims 1 and 16 both described the "abstraction protocol" comprising "a full-duplex protocol supporting full command queuing for the at least one storage media device." '767 patent, 12:47–50, 14:29–32. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d at 1339 ("Structure may also be provided by describing the claim limitation's operation, such as its input, output, or connections."). Defendants contend that "abstraction protocol" nonetheless does not provide sufficient structure "because abstraction is a highly-subjective design process" and, thus, "a POSITA would not immediately know what that structure would look like until they go through significant design efforts." ECF No. 79 at 17. Nothing in the claims, however, indicates that the relevant protocol must be abstracted in a particular way to perform its recited functions, and Defendants do not argue that it must. Defendants cite only the testimony of Dr. Long, who concludes that the patent fails "to inform a POSITA about the exact nature of the 'abstraction protocol,'" but, as explained *supra*, "[c]laim terms 'need not connote a single, specific structure.'" *Dyfan*, 28 F.4th at 1366. Accordingly, the Court finds Section 112(f) does not apply.

In the alternative, Defendants argue the term "abstraction protocol" renders the claims indefinite under *Nautilus*, 572 U.S. at 901. ECF No. 79 at 17–18. Specifically, Defendants argue "the term fails to inform, with reasonable certainty, a POSITA of the scope of the claimed invention because the claims and intrinsic evidence do not provide any objective criteria to determine whether a storage protocol has been sufficiently simplified or generalized to constitute the claimed abstraction protocol." *Id.* The Court disagrees. A patent need not define or describe a term with "absolute or mathematical precision." *BASF Corp.*, 875 F.3d at 1365 (citation modified). As explained *supra*, a POSITA would understand the plain and ordinary meaning of



United States District Court
Northern District of California

"abstraction protocol" to refer to a class of simplified protocols, ECF No. 79-10 ¶ 16; ECF No. 80-2 ¶ 49, and would understand from the claim language that the protocol must comprise "a full-duplex protocol supporting full command queuing for the at least one storage media device" '767 patent, 12:47–50, 14:29–32. This is sufficient to inform a POSITA about the scope of the invention "with reasonable certainty." *See Nautilus*, 572 U.S. at 901.

### D. "storage media device interface" ('767 patent, claims 1 and 16)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "a physical interface for transmitting and receiving commands and data between the edge controller and the storage media device" | Plain and ordinary meaning | Plain and ordinary meaning, which is "an interface that communicates with the storage media device" |

The parties agree that the "storage media device interface" ("SMDI") is an interface that communicates with the storage media device ("SMD"). ECF No. 79 at 18; ECF No. 80 at 20. Plaintiffs argue the term needs no further construction. ECF No. 80 at 20–21. Defendants argue "[t]he claims and specification are clear that a storage media device interface is a particular type of interface" and, accordingly, urge the Court to adopt three negative limitations: the SMDI must be "physical," the SMDI must "transmit[] and receiv[e] commands and data," and this transmission must occur "between the edge controller and the storage media device." ECF No. 79 at 18. The Court declines to adopt these limitations.

Claims 1 and 16 disclose a "[a] routable packet-switched network supported by an abstraction protocol." '767 patent, 12:33–34, 14:1–2. In claim 1, this network comprises "at least one host," "a master controller," and "at least one edge controller." *Id.*, 12:35–40. The "edge controller," in turn, contains "at least one storage media device interface to communication with at least one storage media device." *Id.*, 12:44–45. In claim 16, the recited network comprises "at least one host," "a first master controller," "a first edge controller control link interface to communicate with the first master controller via the first master controller control link interface," "a second master controller," and "at least one storage media device interface to communicate



United States District Court
Northern District of California

with at least one storage media device." *Id.*, 14:3–26. The specification likewise describes a "storage media device interface to communicate with at least one storage media device," *id.*, 2:35–36, 3:1–2, but does not otherwise define this interface.

Neither the claims nor the specification provides that the SMDI must "transmit[] and receiv[e] commands and data," as Defendants propose. *See* ECF No. 79 at 18. Indeed, Defendants provide no support, intrinsic or extrinsic, for this proposed limitation. While the parties agree that the SMDI must communicate with the SMD, the Court declines to hold that this communication must entail "transmitting and receiving commands and data." *See id.*

Defendants provide scarcely more support for their position that the SMDI must be a "physical" interface. *See id.* First, Defendants point to various dictionaries that describe hardware interfaces. ECF No. 79 at 19; *see, e.g.*, ECF No, 79-15 at 4 (defining "interface" as "[a]n architectural concept that provides interconnection between physical blocks at reference points"). However, several of these dictionaries also describe non-hardware—that is, non-physical—interfaces. *See* ECF No. 79-11 at 4 ("The point at which a connection is made between two hardware devices, between a user and a program or operating system, or between two applications."); ECF No. 79-14 at 4 (also describing non-physical software and user interfaces). These definitions simply do not support the conclusion that interfaces must always be "physical." Second, Defendants argue that "[t]he specification states that the storage media device interfaces communicate with the storage media devices 'via SATA and/or SAS links,' which are known physical, point-to-point links." ECF No. 81 at 13 (quoting '767 patent, 5:38–40, 6:33–35). "For the storage media device interface to operate 'via SATA and/or SAS links,'" they contend, "it must be a physical interface." *Id.* Defendants point to no evidence supporting their assertions that "SATA and/or SAS links" are "known physical, point-to-point links" and that an SMDI operating via these links must be "physical." *See id.* Accordingly, the Court declines to adopt this negative limitation.

Lastly, Defendants' contention that the SMDI must communicate "between the edge controller and the storage media device" is also unavailing. *See* ECF No. 79 at 18. As noted *supra*, the parties agree the SMDI must communicate with the SMD. *See* ECF No. 79 at 18; ECF

No. 80 at 20. Defendants offer several arguments in support of their position that this communication must occur between the SMD and the edge controller. First, they point to claim language indicating the SMDI "is the only claimed interface used to communicate with a storage media device." ECF No. 79 at 18. The Court fails to see how it follows that the communication must be with the *edge controller*, as opposed to the other components of the recited network.[3] Defendants' argument that "[t]he storage media device interface is the only type of interface used to connect an edge controller with a storage media device in the specification," ECF No. 79 at 18, fails for the same reason: Even assuming it is true that the SMDI is the only type of interface that can enable communication between the SMD and the edge controller, it does not follow that the SMDI cannot also enable communication between the SMD and other network components.

Next, Defendants argue the SMDI "is located within the edge controller." ECF No. 81 at 14. The claim language, however, indicates the SMDI need not always be located inside the edge controller. While claim 1 recites an "edge controller comprising . . . at least one storage media device interface," '767 patent, 12:40–45, claim 16 lists the SMDI as a component of the "routable packet-switched network" *separate from* the edge controller, *id.*, 14:15–33.[4] Moreover, even assuming the SMDI were necessarily a component of the edge controller, Defendants do not explain why this would mean the SMDI could *only* communicate between the SMD and the edge controller—that is, why being located inside the edge controller would prevent the SMDI from enabling communication with other components of the network.

Accordingly, the Court rejects Defendants' proposed limitations and concludes that the plain and ordinary meaning of "storage media device interface" is, simply, "an interface that communicates with the storage media device."

---

[3] In their reply, Defendants claim "[t]he specification describes how . . . only the edge controller can communicate with storage media devices." ECF No. 81 at 14. The portions of the specification they cite do not support this proposition. Rather, those portions recite "one or more SMD interfaces . . . which communicate with one or more SMDs." '767 patent, 5:38–40, 6:32–35. They do not mention edge controllers.

[4] In their reply, Defendants assert that claim 16 recites the SMDI as a component of the edge controller, but Defendants describe the language and structure of claim 1, not claim 16. *See* ECF No. 81 at 14.

**E. "interleaved memory" ('753 patent, claims 4, 7, and 15)**

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "an arrangement of different types of memory that are alternately accessed to achieve an average access bandwidth" | "blended different types of memory" | "an arrangement of different types of memory alternately accessed to achieve an average access bandwidth" |

The parties present two disputes regarding this term: first, whether "interleaved memory" must "achieve an average access bandwidth," and second, whether the different types of memory in "interleaved memory" must be "alternately accessed."

Claims 4, 7, and 15 recite "interleaved memory" as one of several kinds of "memory superposition[s] with selectable arrangement[s]" of memory types. '753 patent, 18:7–10, 18:64–19:1, 20:35–39. The specification describes "memory superposition" as "two or more types of memory . . . made available for a data flow or other data processing operation." *Id.*, 7:2–9. It describes "interleaved memory" as an "arrangement of memory superposition . . . to achieve an average access bandwidth." *Id.*, 8:35–36. The specification further explains that in an "interleaved memory" arrangement, "[i]nput bandwidth, output bandwidth, or power could be blended among different types of RAM or drives such as rotational or disk drives versus solid-state drives, storage media modules, and different drive interfaces." *Id.*, 8:37–40. In other words, the specification describes "interleaved memory" as a particular "arrangement" of two or more types of memory in which the memories' characteristics—"[i]nput bandwidth, output bandwidth, or power"—are "blended." *Id.*, 8:35–40.

The parties first dispute whether the arrangement of memory types in "interleaved memory" must "achieve an average access bandwidth." ECF No. 79 at 20; ECF No. 80 at 24–25. Plaintiffs argue this language from the specification should not be imported into the term's construction because it describes an optional outcome the claim language itself does not require. ECF No. 80 at 24–25. Defendants respond that this outcome is necessary to the term's meaning because it is what distinguishes "interleaved memory," a type of memory superposition, from all other types of memory superpositions. ECF No. 79 at 21. In other words, without the requirement

that memory characteristics be blended "to achieve an average access bandwidth," "interleaved memory" would just be an arrangement of "two or more types of memory . . . made available for a data flow or other data processing operation," '753 patent, 7:2–9, no different from any other type of memory superposition. *Id.* Plaintiffs respond, in turn, that the feature that distinguishes "interleaved memory" from "memory superposition[s]" more broadly is that "'interleaved memory' requires that different types of memory be 'blended together,' while 'memory superposition' only requires 'two or more types of memory.'" ECF No. 80 at 24. In other words, Plaintiffs contend that "the memory types themselves must be blended so that the bandwidth and power can be applied among the different types of memory." *Id.*

The Court agrees with Defendants. First, the Court finds the specification's explanation that "interleaved memory" is used "to achieve an average access bandwidth" to be probative of the term's meaning. *See* '753 patent, 8:35–36. While it is true that the specification is not normally limiting, *see Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (stating that "limitations from the specification are not to be read into the claims"), here the specification provides the patent's only description of "interleaved memory." It provides this description, moreover, in a larger discussion about the features and uses of different kinds of memory superposition. '753 patent, 8:35–46. In this context, the specification indicates that "achiev[ing] an average access bandwidth" is what distinguishes "interleaved memory" from every other type of recited memory superposition. *See id.* This suggests, in turn, that "achiev[ing] an average access bandwidth" is a defining feature of the "interleaved memory," not an optional outcome. *See id.*[5]

Second, Plaintiffs' contention that "the memory types themselves must be blended" misreads the specification. *See* ECF No. 80 at 24. The specification states that "[i]nput bandwidth, output bandwidth, or power could be blended among different types of" memory. '753 patent, 8:37–38. The "[i]nput bandwidth, output bandwidth, [and] power" are the objects of

[5] At the claim construction hearing, Plaintiffs urged the Court to clarify that "interleaved memory" need not achieve a "perfect average" of access bandwidths. Because Plaintiffs raised this argument for the first time at the hearing, the Court declines to consider it.

that sentence—that is, the things being blended. *See id.* That they are blended "among different types of memory" indicates only that the "interleaved memory" arrangement contains "different types of memory" whose bandwidth and power capabilities are blended. *See id.* Indeed, Plaintiffs provide no explanation of what it would mean for "different types of memory [to] be 'blended together,'" ECF No. 80 at 24, if not that the characteristics of those types of memory are blended.

Lastly, Plaintiffs' extrinsic evidence appears to contradict their position. Plaintiffs offer a technical dictionary defining "interleaved memory" as "a memory system consisting of several memory modules (or banks) with an assignment of addresses that makes consecutive accesses fall into different modules." ECF No. 80-7 at 31. That definition further explains that interleaved memory "increases the effective memory bandwidth." *Id.* This definition indicates, first, that the different kinds of memory in "interleaved memory" are arranged in separate "modules"—not, as Plaintiffs contend, "blended together." *See id.*; ECF No. 80 at 24. Moreover, it confirms the specification's explanation that the memory types are arranged this way to combine their capabilities and, in effect, increase the available bandwidth. *See* ECF No. 80-7 at 31.

The parties next dispute whether the different types of memory in "interleaved memory" must be "alternately accessed." ECF No. 79 at 20; ECF No. 80 at 25. The Court notes, as an initial matter, that it is unclear what each party understands "alternately accessed" to mean. Defendants provide little explanation, stating only that, in an "interleaved memory" arrangement, "access to the memories are alternated (interleaved) between those different memories." ECF No. 79 at 20. Specifically, Defendants do not clarify whether only *requests* to memory must alternate across memory types or whether memories must also fulfill these requests one at a time, in alternating fashion. Plaintiffs, meanwhile, provide examples of other ways "'interleaved memory' can be accessed"—"such as in a staggered or parallel fashion" or "sequentially"—without explaining how these methods would differ from an arrangement in which memories are "alternately accessed." ECF No. 80 at 25.

Thus, the Court finds extrinsic evidence helpful. The dictionary to which both parties cite defines "interleaved memory" as follows:

> [A] memory system consisting of several memory modules (or banks)



United States District Court
Northern District of California

> with an assignment of addresses that makes consecutive accesses fall into different modules. This increases the effective memory bandwidth, as several memory requests can be satisfied (concurrently by several modules) in the same time as it would take to satisfy one memory requests [sic]. For example, a simple arrangement (sequential interleaving), which favors sequential access, is to assign address *k* to memory bank *k* mod *N*, where *N* is the number of modules employed: the reference stride is 1, so consecutive requests are to different bands.

ECF No. 80-7 at 31. This description makes two things clear. First, in an "interleaved memory" system, "consecutive accesses fall into different modules." *Id.* Second, in such a system, "several memory requests can be satisfied . . . concurrently by several modules." *Id.* This indicates that "access[ing]" the "memory modules" entails making requests to those modules. *Id.* And it indicates, too, that while the memory modules can satisfy these requests "concurrently," the requests must alternate among different memory types, such that "consecutive accesses fall into different modules." *Id.*

This understanding aligns with the intrinsic record. As explained *supra*, the specification makes clear that "interleaved memory" is an "arrangement of memory superposition . . . to achieve an average access bandwidth." *Id.*, 8:35–36. In order to "achieve an average access bandwidth"—that is, to blend the "[i]nput bandwidth, output bandwidth, or power" of the different kinds of memory in any given arrangement—requests would have to alternate among the constituent memory types. *See id.*, 8:35–38. Accordingly, the Court concludes that memory in an "interleaved memory" arrangement must be "alternately accessed."[6]

### F. "swapped memory over a specified address range" ('753 patent, claims 4, 7, and 15)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "memory with a specified address range where information is moved between the memory and non-volatile | Plain and ordinary meaning | Plain and ordinary meaning, which is "a memory arrangement where information is moved between memory and disk for a |

[6] At the hearing, Plaintiffs also urged the Court to clarify that accesses need not alternate "perfectly" among different memory types. Again, the Court declines to consider an argument raised for the first time at the hearing.

| | | |
|---|---|---|
| storage" | | specified range of memory addresses" |

The parties appear to agree this term's plain and ordinary meaning should apply, but they disagree as to what that meaning is. *See* ECF No. 79 at 21–22 (arguing Defendants' proposed construction "tracks the well-known meaning of this term of art"); *Mad Catz Interactive, Inc. v. Razer USA, Ltd*, No. 3:13-CV-2371-GPC-JLB, 2015 WL 8482754, at *8 (S.D. Cal. Dec. 8, 2015) (adopting the plain and ordinary meaning a POSITA would find); ECF No. 80 at 25–27 (arguing plain and ordinary meaning applies). Plaintiffs contend "[t]he plain and ordinary meaning of 'swapped memory over a specified address range' is just what it says: memory that has been swapped (or moved) between storage locations for a specified range of memory addresses." ECF No. 80 at 25–26. Defendants' proposed construction differs in two ways. First, it provides that "information," rather than memory, is swapped. ECF No. 79 at 21. Second, it provides that the information must be moved "between the memory and non-volatile storage." *Id.* The Court will therefore resolve this dispute.

Claims 4, 7, and 15 recite "swapped memory over a specified address range" as one of several kinds of "memory superposition[s] with selectable arrangement[s]" of memory types. '753 patent, 18:10–11, 19:1–2, 20:39–40. As the Court explained *supra*, the specification describes "memory superposition" as "two or more types of memory . . . made available for a data flow or other data processing operation." *Id.*, 7:2–9. Neither the claims nor the specification provides any further description of "swapped memory over a specified address range." While Plaintiffs insist the plain and ordinary meaning is "straightforward," they never explain what, exactly, it means to "swap" or move memory. *See* ECF No. 80 at 26.

The Court therefore turns to extrinsic evidence to discern what meaning a POSITA would ascribe to the term. *See Actelion Pharms. LTD v. Mylan Pharms. Inc.*, 85 F.4th 1167, 1173–74 (Fed. Cir. 2023) ("[T]his case is one where the proper claim construction cannot be reached without the aid of extrinsic evidence."). This evidence makes clear that the process of "swapping memory" entails moving information between storage locations. Defendants offer two technical dictionaries defining related terms. The first defines "swap" as "[t]o move segments of programs



United States District Court
Northern District of California

or data between memory and disk storage." ECF No. 79-19 at 4. It further defines "swapping" as "moving blocks of information in units known as pages between memory and disk as they are needed during the execution of the application." *Id.* The second defines a "swap file" as "an area on a hard disk of a computer into which any information not immediately required may be moved, thus maximizing the available memory." ECF No. 79-20 at 4. Plaintiffs complain that neither of these dictionaries defines the full term "swapped memory," "the term the patentees chose to put in the claims." ECF No. 80 at 26. The cited definitions do, however, refer to terms describing the process of swapping information between storage locations. The Court finds it reasonable to conclude, in the absence of any evidence to the contrary, that "swapped memory" is what results from this process. Accordingly, the Court finds this evidence probative of the meaning a POSITA would assign the term "swapped memory," *see Phillips*, 415 F.3d at 1318, and concludes that "swapped memory" refers to a memory arrangement where information is moved between storage locations.

The parties also dispute whether this information must be moved "between memory and non-volatile storage," as Defendants contend, ECF No. 79 at 21, or can be moved "between memory locations," as Plaintiffs contend, ECF No. 80 at 26. Here, too, the claims and specification are silent, and thus both parties rely on extrinsic evidence. Plaintiffs point to a definition of "bank switching," "[a] method of expanding a computer's available random access memory (RAM) by switching between banks of RAM chips that share a range of memory addresses," ECF No. 80-2 at 27, which Plaintiffs argue shows that "swapped memory" can involve movement "*between memory locations*," ECF No. 80 at 26 (emphasis in original). Plaintiffs' expert, Dr. Lin, testifies that "bank switching is a type of swapped memory (or memory swapping)," but Plaintiffs provide no other evidence to that effect. Notably, the definition of "bank switching" does not mention "swapping," *see* ECF No. 80-2 at 27, nor do the definitions of "swap" or "swapping" mention "bank switching," *see* ECF No. 79-19 at 4. Indeed, the description of "bank switching," which entails alternating access to different banks of RAM chips, does not seem, on its face, to be related to the process of memory swapping, which, as described *supra*, entails moving information between storage locations. *See* ECF No. 80-2 at 27.

The Court finds more persuasive the dictionary definitions of "swap," "swap file," and "swapping" offered by Defendants. Each of these definitions describes information moving between memory and "disk," a form of non-volatile storage.[7] ECF No. 79 at 22; *see* ECF No. 79-19 at 4; ECF No. 79-20 at 4. Moreover, these definitions indicate that moving information between memory and non-volatile storage is precisely the point of memory swapping, as it "enabl[es] an operating system, and therefore a computer, to address—roughly, have available—more memory than is physically present in the system." ECF No. 79-19 at 4. Accordingly, the Court concludes that, in a "swapped memory" arrangement, information is moved between memory and non-volatile storage.

### G. "one or more swappable pods or cards" / "the plurality of swappable pods or cards" ('753 patent, claims 1–6)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| Indefinite | "[one or more / plurality of] pods or cards that are removable, insertable, or replaceable" | "one or more pods or cards that are removable, insertable, or replaceable," which does not render the claims indefinite |

Defendants do not appear to challenge Plaintiffs' proposed construction. Instead, Defendants contend that claims 1 and 3 are indefinite because they refer at certain times to "one or more swappable pods or cards" and at other times to "the plurality of swappable pods or cards." ECF No. 79 at 23. "The inconsistent use of plural and singular forms," Defendants argue, "renders the claims indefinite because it is uncertain whether the claims can be satisfied by just one swappable pod or card." *Id.*

The Court disagrees. Defendants are correct that the claim language is inconsistent: "Plurality," on its face, appears to refer to two or more of something, while "one or more" can encompass only one of something. The Federal Circuit, however, has cautioned against such a

[7] At the hearing, the parties agreed that "disk" is one of many forms of non-volatile storage, including ROMs and solid-state drives, the latter of which is referenced in the specification's description of "interleaved memory." *See* '753 patent, 8:39.

mechanical reading of similar claim language. *See Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("[I]in context, the plural can describe a universe ranging from one to some higher number, rather than requiring more than one item."). Accordingly, the presumption that "a plural term refers to two or more items" can be "overcome when the broader context shows a different meaning applies." *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 261–62 (Fed. Cir. 2022).

Here, the context of the claims makes clear that "the plurality of swappable pods or cards" refers to "one or more swappable pods or cards." Claim 1, for example, begins by reciting "[a] platform for data flow processing, comprising . . . one or more swappable pods or cards in one or more chassis." '753 patent, 17:39–41. It then recites a requirement that applies to "each of the one or more swappable pods or cards—namely, that each must have "one or more hardware modules or one or more software modules." *Id.*, 17:43–43. The claim then recites a requirement that applies to only "one or more of the plurality of swappable pods or cards"—namely, "having a portion for user-definable hardware modules or user-definable software modules." *Id.*, 17:46–48. The "plurality of swappable pods or cards" shorthand thus allows the claim to distinguish between situations where only "one or more of the plurality of swappable pods or cards" must meet a requirement, *id.* 17:46–47, and situations where all of "the plurality of swappable pods or cards" must meet a requirement, *id.*, 17:49–50. In this context, it would be clear to a POSITA that "the plurality of swappable pods or cards" refers to the above-listed "one or more swappable pods or cards." *See id.*, 17:40–51. Claim 3, which refers to the same "swappable pods or cards" recited in claim 1, would likewise be clear. *See id.*, 17:65–18:4. Accordingly, the Court concludes claims 1 and 3 are not indefinite and adopts Plaintiff's construction.

### H. "programmable logic device" ('943 patent, claims 1 and 10)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "an integrated circuit where the user can alter the connection pattern of the circuits" | Plain and ordinary meaning | Plain and ordinary meaning, which is "an integrated circuit with user-programmable electronic circuitry" |

Here, the parties disagree about the scope of their dispute in two respects. First, the parties disagree about whether construction is necessary. Plaintiffs again urge that no construction is needed because Defendants have not argued lexicography or disavowal. ECF No. 80 at 30. Though the Court, again, agrees that Defendants have not provided a reason to depart from the term's plain and ordinary meaning, it nonetheless must resolve the dispute between the parties as to the scope of that meaning. *See O2 Micro*, 521 F.3d at 1362. Thus, the Court will determine whether Defendants' proposed construction comports with "the meaning a person of ordinary skill in the art at the time of the invention would have given" the term, in light of the patent as a whole. *See Bradium Techs.*, 923 F.3d at 1042.

Second, the parties disagree about the scope of their proposed constructions. Notably, each side appears to mischaracterize the other's position. Defendants contend that Plaintiffs advocate a construction that would broaden "programmable logic device" ("PLD") "to encompass devices where the software is programmable but the circuits are not." ECF No. 79 at 24. Plaintiffs, however, make clear that they "do not contend that a PLD includes a device where only 'the software is programmable'" and that they agree a PLD must have "electronic circuitry" that is programmable or reprogrammable." ECF No. 80 at 29. Plaintiffs, for their part, insist Defendants' construction requires "that the underlying circuitry . . . be capable of being *physically* altered, such that circuitry capable of being altered via firmware or software would not qualify as a PLD." ECF No. 80 at 29–30 (emphasis in original). But Defendants disclaim this position, acknowledging that, "[w]hether the circuits are changed by blowing fuses or by using a controller running specialized software or firmware that alter circuitry, the essential point is that these techniques modify the actual connection patterns of the circuits within the PLD." ECF No. 81 at 20–21. Thus, the parties appear to agree that a PLD must include programmable electronic circuitry, *see* ECF No. 79 at 24; ECF No. 80 at 29, and that this electronic circuity can be altered physically or via software, *see* ECF No. 80 at 31–33; ECF No. 81 at 20–21.

Accordingly, the Court takes the parties' dispute to be whether the plain and ordinary meaning of "programmable logic device" requires that (1) the PLD be an integrated circuit ("IC")

and (2) the user be able to alter the "connection pattern of the circuits" within the PLD.[8] The Court concludes that the PLD must be an integrated circuit but that users need not be able the connection pattern of the PLD's circuits, so long as the electronic circuitry is programmable in some way.

Claims 1 and 10 disclose "a programmable device for data flow processing." '943 patent, 17:39, 18:23. This "programmable device," in turn, is comprised of "a programmable logic device (PLD) having a first region and a second region." *Id.*, 17:42–43, 18: 25–26. The "first region" of the PLD contains "a hardware-based or firmware-based router with a port enabling communication between the router and the second region." *Id.*, 17:44–46, 18:27–30. The "second region" contains "sandboxes with user-definable programmable electronic circuits of the PLD." *Id.*, 17:44–49, 18:27–33.

The specification, likewise, describes a PLD "having a first region and a second region," with the second region containing "one or more sandboxes with user-definable electronic circuits." *Id.*, 1:38–44; *see also id.*, 3:12–13 (reciting PLD with "one or more sandboxes for user-defined electronic circuits"). But the specification also indicates that the PLD could take several possible forms. For example, the embodiment represented in Figure 3 shows a "field programmable gate array" ("FPGA") containing the sandboxes that the claims recite as components of the PLD. *Id.*, Fig. 3, 3:8, 4:39–40. The specification further explains that the claimed "programmable device" could be "[a]n FPGA (field programmable gate array), ASIC (application specific integrated circuits), or some hybrid of FPGA/PLD/ASIC, which can be used in pods or cards, has a bridge with an MMI router, and one or more sandboxes for user-defined electronic circuits." *Id.*, 3:8–13; *see also id.*, 4:30–35 ("The programmable device could be, for example, an FPGA as depicted here, a PLD or an ASIC, or more than one of these, or some combination of these, or other programmable device that can configure electronic circuitry . . . .").

Defendants argue that "programmable logic device," as described above, "is a term of art

---

[8] Because Plaintiffs agree the electronic circuitry of a PLD must be programmable, the Court rejects Defendants' argument that "Plaintiffs' construction renders the claim indefinite because it redefines 'PLD' to encompass nearly any IC," including "ICs with fixed circuits that users cannot change." *See* ECF No. 79 at 30–31.

that refers to a specific type of IC with programmable electronic circuits." ECF No. 79 at 24. Defendants point to the patent's file history, which, like the claims and specification, is part of the patent's intrinsic record. *See Vitronics Corp.*, 90 F.3d at 1582. Indeed, during patent prosecution, the applicant distinguished prior art on the grounds that the prior art did not contain the "limitations of 'a programmable logic device (PLD) having a first region and a second region.'" ECF No. 79-22 at 24. The applicant then defined a PLD as "a term of art referring to a specific type of integrated circuit that has user programmable electronic circuits." *Id.* The Court agrees with Defendants that this "express representation[] . . . regarding the scope of the claims," *see Vitronics Corp.*, 90 F.3d at 1582, suggests that a POSITA, reading the patent in its entirety, would understand a PLD to be a "type of integrated circuit," ECF No. 79-22 at 24.

Extrinsic evidence supports this conclusion. Notably, technical dictionaries presented by both parties define "programmable logic device" as a kind of "integrated circuit." ECF No. 79-24 at 15 (defining PLD as "[a]n integrated circuit consisting of an array of logic elements whose interconnection pattern can be programmed"); ECF No. 80-7 at 33 (defining PLD as "an integrated circuit able to implement combinational and/or sequential digital functions defined by the designer and programmed into this circuit"). Plaintiffs also cite extrinsic sources that describe PLDs more broadly. *See, e.g.*, ECF No. 80-17 at 13 (defining PLD as "[a] logic device where the designer must program the function required into the device"). Those more inclusive definitions cannot, however, broaden the meaning of the term beyond the intrinsic record, which supports the conclusion that a PLD is a "specific type of integrated circuit." ECF No. 79-22 at 24.

However, the Court does not find any support in the intrinsic record for Defendants' contention that the user of a PLD must be able to alter the "interconnection pattern" of the devices' circuits. *See* ECF No. 79 at 24. While the claims, specification, and prosecution history all describe a PLD having user-programmable electronic circuits, none of these sources specifies what aspect of the circuitry must be programmable. *See* '943 patent, 1:38–44, 3:12–13, 17:44–49, 18:27–33; ECF No. 79-22 at 24. On their face, these descriptions do not appear to limit the PLD's programmability to the "interconnection pattern" of its circuits.

Indeed, the specification indicates that the PLD's programmability is not so limited. As

noted *supra*, the specification makes clear that the recited PLD may be "an FPGA," "a PLD," "an ASIC, or more than one of these, or some combination of these, or other programmable device that can configure electronic circuitry." '943 patent, 4:30–34; *see also id.*, 3:8–11. While this description, which lists PLD as an option separate from FPGA and ASIC, might seem to indicate that a PLD is distinct from an FPGA or an ASIC, the parties appear to agree that an FPGA, at least, is a type of PLD. *See* ECF No. 79 at 26 (describing FPGA as "a type of PLD"); ECF No. 80 at 30–31 (same). And one of the patent's embodiments shows an FPGA containing the sandboxes the claims recite for the PLD, further indicating that the FPGA is, in that embodiment, serving as the PLD. '943 patent, Fig. 3, 4:39–40. In other words, a POSITA reading the specification would understand that the recited PLD could be an FPGA, an ASIC, "or some combination of these." *See id.*, 4:32–33. Apart from the requirement that the PLD be an "integrated circuit," ECF No. 79-22 at 24, the only limitation apparent in the intrinsic record is that it be a "programmable device that can configure electronic circuitry," '943 patent, 4:33–34.

Moreover, Plaintiffs offer expert testimony indicating that ASICs—which, again, are described in the specification as a type of PLD—can be programmed without changing their circuits' "interconnection patterns." *See* ECF No. 80-2 at 29. Specifically, Plaintiffs' expert testifies that an ASIC "can provide configurability of the circuitry in any variety of manner[s] as the designer of the ASIC contemplates, including the operational aspect of the circuitry themselves." *Id.* For example, an ASIC "can be programmed to perform differing number of inputs operating at different sample rates," a kind of programmability "not associated with the connection patterns of circuitry." *Id.* Defendants do not present any evidence, intrinsic or extrinsic, challenging this conclusion. Defendants rely instead on dictionary definitions and textbooks describing the process of programming a PLD as changing the "interconnection pattern" of the device. *See* ECF No. 79-24 at 15; ECF No. 79-25 at 6–7; ECF No. 79-23 at 18. This extrinsic evidence cannot, however, overcome the intrinsic record, which suggests that the recited PLD can be any device "that can configure electronic circuitry." '943 patent, 4:33–34. Thus, Court concludes that a user need not be able to alter the connection pattern of the circuits within a PLD, so long as the user can program the electronic circuitry in some way.



United States District Court
Northern District of California

### I. "geographical area" ('634 patent, claims 1, 8, and 15)

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
| --- | --- | --- |
| "physical place such as an apartment complex, neighborhood, city, or state" | Plain and ordinary meaning | Plain and ordinary meaning, no construction necessary |

Defendants ask the Court to construe "geographical area" to mean a "physical place such as an apartment complex, neighborhood, city, or state." ECF No. 79 at 31. Defendants argue the term requires construction because "Plaintiffs contend that an IP address is equivalent to a geographical area, but . . . this is incorrect because an IP address is not a physical place." ECF No. 79 at 31.

This argument is inappropriate at the claim-construction stage. The Court's duty, at this juncture, is to resolve "fundamental dispute[s] regarding the scope of a claim term." *O2 Micro*, 521 F.3d at 1362. "[C]ourts should not resolve questions that do not go to claim scope, but instead go to infringement . . . ." *Id.*; *see also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (finding dispute concerning "factual questions relating to the test for infringement" inappropriate to resolve in claim construction). The question whether an IP address is a geographical area is plainly a factual question that goes to infringement and is thus for the jury, not the Court, to resolve.

Defendants provide no other argument justifying construction of this apparently straightforward term. Defendants cite only a description of "geographical area" provided in the specification. ECF No. 79 at 32; *see* '634 patent, 2:52–56 (describing a "network connection" in a "geographic area (such as an apartment complex, neighborhood, or city to city or state to state network connection)"). Defendants do not, however, argue that this description supplants the plain and ordinary meaning because the patentee either "act[ed] as his own lexicographer" or "disavow[ed] the full scope of a claim term." *See Thorner*, 669 F.3d at 1365. Nor do Defendants argue, or even suggest, that the plain and ordinary meaning is ambiguous and requires defining. Accordingly, the Court concludes that no construction is necessary and gives the term its plain and

ordinary meaning.

**J. "network connected device" ('634 patent, claims 16 and 20)**

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| Indefinite | Plain and ordinary meaning | Plain and ordinary meaning<br>Not indefinite |

Defendants argue claims 16 and 20, both of which recite a "network connected device," are indefinite because they are circular. ECF No. 79 at 34. Defendants' argument goes as follows: Claims 16 and 20 disclose the "network connected device" of claim 15, and claim 15, in turn, says the "network connected device" is "acting as a tuner server." ECF No. 79 at 34–35. Claim 16 requires the "network connected device" to send various values and information to "the tuner server"—that is, to itself. ECF No. 79 at 35. Claim 20 similarly requires the "network connected device" to send certain data "to the network connected device"—again, to itself. *Id.* Defendants assert that "[r]equiring a network connected device to function circularly makes no sense and a POSITA would not have understood its meaning." *Id.*

While the Court recognizes that the processes Defendants have identified appear to be circular, it finds that Defendants have not met their burden of showing, by clear and convincing evidence, that this circularity renders the claims indefinite. *See Sonix Tech.*, 844 F.3d at 1377. Nowhere do Defendants explain why these circular processes would be impossible—that is, why a "network connected device" would be unable to send information to itself. The only evidence they offer on this point is the testimony of an expert who likewise describes the circularity and states, with no additional support, that "[i]t does not make sense for the 'network connected device' to function circularly as it does in claims 16 and 20" and, "[c]onsequently, a person of ordinary skill in the art would not have understood the meaning of the term." ECF No. 79-28 at 9–10; *see* ECF No. 79 at 35. Such "conclusory, unsupported assertions by experts . . . are not useful" to the Court. *See Phillips*, 415 F.3d at 1318. Moreover, they are at odds with expert testimony submitted by Plaintiffs, which suggests that it is possible, or perhaps even standard, for "network connected device[s]" to send information to or from themselves. ECF No. 80-2 at 31

(explaining a "network connected device" can "exercise control and decision-making over . . . endpoints" and direct those endpoints to "send data back to itself"). Accordingly, the Court finds the claims are not indefinite, and it gives the term its plain and ordinary meaning.

**K. "transmission bandwidth" ('634 patent, claims 1, 2, 5, 6, 8, 9, 12, 13, 15, 16, 19, and 20)**

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction | Adopted Construction |
|---|---|---|
| "actual bandwidth used for the next network connection, not a value such as a bandwidth ceiling" | Plain and ordinary meaning | Plain and ordinary meaning |

Independent claims 1, 8, and 15 disclose various methods and devices that "initiat[e]" a "next network connection . . . with a transmission bandwidth based on the parameter values for the past network connection." '634 patent, 14:9–13, 14:63–67, 16:3–8. Defendants argue that statements Plaintiffs made in a parallel inter partes review ("IPR") proceeding disclaimed claim scope by making clear that "transmission bandwidth," in the context of this patent, does not denote "a value such as a bandwidth ceiling." ECF No. 115 at 2. Plaintiffs respond that Defendants "do not meet the demanding standard for prosecution disclaimer" and, thus, that the Court should give the term its plain and ordinary meaning without further construction. The Court agrees with Plaintiffs.

"[F]or prosecution disclaimer to attach," the allegedly "disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003); *see also, e.g.*, *Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) ("We therefore do not consider the applicants' statement to be a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided by the written description."). Accordingly, the Federal Circuit has "consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope." *Omega Eng'g*, 334 F.3d at 1325.

In the parallel IPR proceeding, Defendants argued, *inter alia*, that the '634 patent was



United States District Court
Northern District of California

invalid because it was anticipated by certain prior art ("Erskine"). ECF No. 115 at 13–16. Plaintiffs distinguished Erskine by explaining that "Erskine teaches a binary, accept/reject decision as to whether to allow a new call to proceed based on a comparison between the bandwidth needed for the call and a predetermined 'sliding maximum interzone bandwidth value.'" *Id.* at 22. Thus, Plaintiffs explained, Erskine only "discloses a bandwidth ceiling for new calls—there is no disclosure of establishing or setting the transmission bandwidth for the 'next network connection,' based on past parameter values or otherwise." *Id.* at 25–26.

The Court does not find that these statements "clearly and unambiguously surrendered values such as bandwidth ceilings from the scope of 'transmission bandwidth.'" *See id.* at 3. Plaintiffs did not distinguish Erskine only on the grounds that Erskine recited "a bandwidth ceiling," as Defendants appear to suggest. *See id.* Rather, Plaintiffs distinguished Erskine on the grounds that it recited a "bandwidth ceiling" that would be used for a function not contemplated by the '634 patent: deciding "whether to allow a new call to proceed." *Id.* at 22. As Plaintiffs explained during the IPR, the "transmission bandwidth" recited in the '634 patent is the bandwidth value applied to calls that are being "initiat[ed]"—that is, calls that have already been allowed to proceed. *See id.*; '634 patent, 14:9, 14:63, 16:3. Plaintiffs' statements do not "clear[ly] and unmistakabl[y]" disclaim the use of a bandwidth ceiling for this purpose. *See Omega Eng'g*, 334 F.3d at 1326.

Accordingly, the Court rejects Defendants' proposed construction and gives the term its plain and ordinary meaning.

## V. MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE

Defendants moved for leave to file supplemental evidence consisting of: (1) a chart identifying each disputed claim term and the quotations from the inventor's deposition identified by each side, and (2) excerpts from the inventor's deposition. ECF No. 306. The Court will deny the motion. As the Federal Circuit has observed, "what the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1194 (Fed. Cir. 2003) (quoting *Solomon v. Kimberly–Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000)). Moreover, even if the

Court were to admit this evidence, it would not change the Court's analysis regarding any of the contested claim terms.

## CONCLUSION

The Court construes the disputed claim language as follows:

| Term | Claim(s) | Court's Construction |
|---|---|---|
| "queue implemented in hardware" | '596 patent (claims 1, 7, and 13) | Plain and ordinary meaning, which does not exclude software intervention<br>Not indefinite |
| "register" | '596 patent (claims 1, 7, and 13) | Plain and ordinary meaning |
| "abstraction protocol" | '767 patent (claims 1, 2, 4, 6, and 16) | Plain and ordinary meaning<br>Not subject to § 112(f) and not indefinite |
| "storage media device interface" | '767 patent (claims 1 and 16) | Plain and ordinary meaning, which is "an interface that communicates with the storage media device" |
| "interleaved memory" | '753 patent (claims 4, 7, and 15) | "an arrangement of different types of memory alternately accessed to achieve an average access bandwidth" |
| "swapped memory over a specified address range" | '753 patent (claims 4, 7, and 15) | Plain and ordinary meaning, which is "memory where information has been moved between memory and disk for a specified range of memory addresses" |
| "one or more swappable pods or cards" / "the plurality of swappable pods or cards" | '753 patent (claims 1–6) | "one or more pods or cards that are removable, insertable, or replaceable," which does not render the claims indefinite |
| "programmable logic device" | '943 patent (claims 1 and 10) | Plain and ordinary meaning, which is "an integrated circuit with user-programmable electronic circuitry" |
| "geographical area" | '634 patent (claims 1, 8, and 15) | Plain and ordinary meaning, no construction necessary |
| "network connected device" | '634 patent (claims 16 and 20) | Plain and ordinary meaning<br>Not indefinite |
| "transmission bandwidth" | '634 patent (claims 1, 2, 5, 6, 8, 9, 12, 13, 15, 16, 19, and 20) | Plain and ordinary meaning |

Defendants' motion for leave to file supplemental evidence is denied.

The Court sets a case management conference on November 20, 2026 at 1:30 p.m. An updated joint case management statement is due November 13, 2026.

**IT IS SO ORDERED.**

Dated: October 23, 2026

JON S. TIGAR
United States District Judge

United States District Court
Northern District of California